UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------------- x
JEWISH COMMUNITY CENTER OF STATEN      :
ISLAND,                                :
                                       :
                        Plaintiff,     :        MEMORANDUM AND ORDER
                                       :
            -against-                  :        09-CV-02028 (ENV) (JMA)
                                       :
TRUMBULL INSURANCE COMPANY,            :
                                       :
                        Defendant.     :
-------------------------------------------------------------- x

VITALIANO, D.J.

On April 3, 2009, Plaintiff Jewish Community Center of Staten Island ("the JCC")

commenced this action in Supreme Court, Richmond County, against defendant Trumbull

Insurance Company ("Trumbull"). On May 13, 2009, Trumbull removed the action to this Court

under 28 U.S.C. §§ 1441 and 1446, citing diversity of citizenship. (Notice of Removal (Dkt. No.

1)). Substantively, the JCC seeks a declaration that the insurance policy it purchased from

Trumbull requires defendant to insure, defend, and indemnify it in an underlying lawsuit filed by

the mother of a former JCC employee. (*See* Simnowitz Decl. (Dkt. No. 17), Exh. F at 7).

Trumbull contends that it properly denied coverage pursuant to a clause in the policy excluding

claims based on the kind of conduct alleged in the underlying suit. For the reasons that follow,

on the duel cross-motions of the parties, summary judgment is awarded in favor of the JCC is

denied as to Trumbull.

## Background

### a. *The Insurance Policy*

There is little dispute as to the facts of the case; the battle is pitched as to their legal

significance. It is unchallenged that, at some point prior to the alleged acts of an employee

1

spotlighted in the underlying action, the JCC purchased a Non Profit Directors and Officers

Liability Insurance Policy, No. NOA0303680 ("the policy"), from Trumbull to cover the period

lasting between April 22, 2005 and April 22, 2006. (Simnowitz Decl., Exh. A at PDF p. 1). The

policy provides a $5 million aggregate in liability coverage, subject to a $15,000 deductible for

each "employment practice claim." (*Id.*). The policy's core clause ("the coverage provision")

reads as follows:

> The COMPANY[1] shall pay on behalf of an INSURED[2] all CLAIMS EXPENSES and
> DAMAGES that the INSURED becomes legally obligated to pay for any CLAIM(s) first
> made against the INSURED for a WRONGFUL ACT(s)[3] which arise solely out of the
> discharge of an INDIVIDUAL INSURED'S[4] duties on behalf of the ENTITY.[5]

(*Id.* at PDF p. 4). The policy also provides for certain exclusions from coverage. Of particular

relevance, it barred coverage for "[a]ny CLAIM arising from any dishonest (including any

INSURED gaining any profit or advantage to which the INSURED was not legally entitled),

---

[1]  "COMPANY" refers to Trumbull.

[2]  "INSURED" is defined as the "ENTITY or an INDIVIDUAL INSURED." (Simnowitz
Decl., Exh. A at PDF p. 9).

[3]  "WRONGFUL ACT(s)" include, among other things, Employment Practices, which are
defined as violations of specified federal anti-discrimination statutes, as well as "any
discrimination, wrongful termination or dismissal, vicarious liability for workplace
harassment (including sexual harassment), breach of any verbal or written employment
contract or quasi-employment contract, employment-related misrepresentation, wrongful
failure to employ or promote, wrongful discipline, wrongful deprivation of a career
opportunity, failure to grant tenure, negligent evaluation, employment-related mental anguish
or employment-related emotional distress, [and/or] retaliation (including lockouts)."
(Simnowitz Decl., Exh. A at PDF p. 10).

[4]  "INDIVIDUAL INSURED" refers to "[a]ny past, present, or future director, officer, trustee,
employee, volunteer or member of any duly constituted committee of the ENTITY but only
with regard to WRONGFUL ACTS which arise solely out of the discharge of the
INDIVIDUAL INSURED'S DUTIES on behalf of the ENTITY." (Simnowitz Decl., Exh. A
at 9).

[5]  "ENTITY" refers to the JCC (Simnowitz Decl., Exh. A at PDF p. 9).

fraudulent, criminal, or malicious WRONGFUL ACT or any WRONGFUL ACT committed

deliberately by an INSURED or at the direction of any INSURED." (*Id.* at PDF p. 10) (the

"original wrongful acts exclusion"). By endorsement, the original wrongful acts exclusion was

deleted and replaced by the following language (the "amended wrongful acts exclusion"), which

excludes from coverage

> [a]ny CLAIM based upon, arising from, or in any way related to any dishonest (including
> any INSURED gaining any profit or advantage to which the INSURED was not legally
> entitled), fraudulent, criminal, or malicious WRONGFUL ACT or any WRONGFUL
> ACT committed deliberately by any INSURED or at the direction of any INSURED,
> provided that: 1) the COMPANY shall reimburse CLAIMS EXPENSES if a final
> adjudication establishes that no such WRONGFUL ACT occurred; and 2) the
> WRONGFUL ACT of any INDIVIDUAL INSURED shall not be imputed to any other
> INDIVIDUAL INSURED.

(*Id.* at PDF p. 20). All other relevant terms and conditions in the Policy remained as they were.

(*Id.*).

### b. *The Underlying Action*

Drew Sanders was the Assistant Executive Director of Health/Physical Education at the

JCC. (Def.'s Rule 56.1 Statement (Dkt. No. 15) ¶ 11). In or around August 2003, Sanders hired

13-year-old Antonio Spinelli as an administrative clerk, expecting that Spinelli would work after

school during the school year and full-time during the summers. (*Id.*). Sanders allegedly forced

Spinelli and other young employees to play a basketball game during work breaks called

"Pressure Shot," in which Sanders punished Spinelli and other boys for missed baskets by

"forcing the boys to pull down their shorts and underwear, throwing them over his lap and

viciously and repeatedly spanking the boys on the behind with his bare hand." (*Id.* ¶ 12). After

approximately two years of abuse, Spinelli disclosed the conduct to his mother, Josephine

Vasallo, who alerted the police. (*Id.*).

On July 5, 2005, Sanders was arrested and charged with second-degree attempted assault,

fourth degree criminal possession of a weapon, 23 counts of forcible touching, 23 counts of third-degree sexual abuse, and two counts of endangering the welfare of a child. (*Id.* ¶ 13; Simnowitz Decl., Exh. C (listing arraignment charges)). On September 15, 2005, Sanders pleaded guilty to three counts of forcible touching and was sentenced to six years probation. (Def.'s Rule 56.1 Statement ¶¶ 14-15; *see also* Simnowitz Decl., Exh. C). He was also required to register as a level-three sex offender. (Def.'s Rule 56.1 Statement ¶ 15).

On April 10, 2008, Vasallo filed the underlying lawsuit ("the Spinelli lawsuit") on behalf of her son against the JCC in Supreme Court, Richmond County, seeking to hold the JCC accountable for Sanders's actions. (*Id.* ¶ 16; Simnowitz Decl., Exh. B). The complaint ("the Spinelli complaint") alleges that "[p]articipation by Sanders, a superior officer, in the course of [Spinelli's] employment, constitutes participation by the Jewish Community Center itself." (Simnowitz Decl., Exh. C ¶ 27). The Spinelli complaint further asserts that the JCC condoned and ratified Sanders's acts of sexual abuse by creating an "intolerable" and "hostile" work environment in violation of the New York City Human Rights Law, which prohibits "an employer or an employee or agent thereof, because of the . . . gender   . . . of any person to discriminate against such person in compensation or in terms conditions or privileges of employment." (Def.'s Rule 56.1 Statement ¶ 16-17; Simnowitz Decl., Exh. C ¶¶ 9, 28-30, 45; N.Y. Admin. Code §8-107(a)). Vasallo seeks $5 million in compensatory damages and an additional $15 million in punitive damages on behalf of her son. (Simnowitz Decl., Exh. C ¶¶ 47-49).

### c.  *Trumbull's Denial of Coverage*

On March 1, 2006, JCC notified Trumbull of the charges against Sanders by faxing a General Liability Notice of Occurrence/Claim form to Aon Associates, Trumbull's reporting

agency. (Warden Decl. (Dkt. No. 26) ¶¶ 3-4, Exh. A; Pl.'s Rule 56.1 Statement (Dkt. No. 23) ¶ 3). The title page of the fax read, "HEREWITH IS NEW CLAIM. PLEASE REVIEW AND PROCESS ACCORDINGLY. PLEASE ADVICE CO. CLAIM # AND ADJUSTER NAME AND PHONE #." (Warden Decl., Exh. A at PDF p. 2). Trumbull did not acknowledge receipt of this fax for 190 days, finally responding by a letter dated September 7, 2006. (Pl.'s Rule 56.1 Statement ¶ 4). In this letter, Trumbull averred that no "Claim" yet existed and that it would treat the March 1, 2006 fax as a "notice of a potential Claim." (Pl.'s SJ Mem. (Dkt. No. 24), Exh. E at PDF p. 3). It further noted that any "later Claim . . . shall be considered to have been made as of the date of notice of the underlying circumstances"—presumably March 1, 2006. (*Id.*) Trumbull also stated that it reserved the right to assert defenses based on the amended wrongful acts exclusion and a separate "[b]odily [i]njury [e]xclusion."[6] (*Id.* at PDF pp. 3-4; Pl.'s Rule 56.1 Statement ¶ 4).

On June 12, 2008, after the commencement of the Spinelli lawsuit, the JCC provided Trumbull with notice of the claim against it and sought the coverage the policy promised. (Warden Decl. ¶¶ 5-6, Exh. B; Pl.'s Rule 56.1 Statement ¶ 5). Then, 105 days later, and over two and a half years after the initial notice of claim was faxed to the insurer, Trumbull denied coverage in a letter dated September 25, 2008. (Pl.'s Rule 56.1 Statement ¶ 6; Pl.'s SJ Mem., Exh. F at PDF pp. 4-5).Trumbull demurred that, while Sanders was an "Insured as defined under the Policy"—and thus an "Individual Insured"—all allegations the Spinelli lawsuit were "based upon, arose from or [were] related to an Insured's Wrongful Act, specifically Sanders's criminal conduct against Spinelli to which he plead guilty and was sentenced." (Pl.'s SJ Mem., Exh. F at

---

[6]   Trumbull ultimately declined to interpose the bodily injury exclusion after the JCC filed a ripe claim in 2008, relying solely on the amended wrongful acts exclusion to disclaim coverage. (*See* Pl.'s SJ Mem., Exh. F at PDF pp. 4-5).

PDF p. 4). Trumbull acknowledged that "[t]he allegations in the [Spinelli] Complaint alleged Wrongful Acts committed by Sanders which arise solely out of the discharge of his duties on behalf of the JCC," but qualified that "[t]o the extent it is argued that the Complaint asserts Claims for Wrongful Acts by Sanders that do not arise solely from the discharge of his duties on behalf of the JCC, then there is no coverage for such Claims in the first place because they fall outside of the [coverage provisions]." (*Id.* at PDF p. 4 n.3).

Furthermore, Trumbull asserted that even if not criminal in nature, Sanders's actions would still be "deliberate Wrongful Act[s] [committed by an Insured]," and hence subject to the amended wrongful acts exclusion. (*Id.* at PDF p. 5.) In addition, Trumbull contended that neither of the two "exceptions" specified in the amended wrongful acts exclusion applied to JCC's claim. As to the first exception, there had been no "final adjudication establish[ing] that no such WRONGFUL ACT occurred;" but, on the contrary, Sanders pleaded guilty. (*Id.* at PDF pp. 4-5). As to the second exception, the JCC—a non-individual entity—was the sole named defendant in the Spinelli lawsuit; meaning, no "WRONGFUL ACT of an INDIVIDUAL INSURED [had been] imputed to any other INDIVIDUAL INSURED." (*Id.* at PDF p. 5). All told, this was the legal cover used by Trumbull to deny the JCC's insurance claim.

On April 3, 2009, the JCC filed suit against Trumbull in Richmond County Supreme Court praying for declarations that its insurance claim was fully covered under the policy and that Trumbull was obligated to insure, defend, and indemnify it in the Spinelli lawsuit, as well as reimburse it for any costs, fees, and other expenses it had incurred because of the suit. (*See* Simnowitz Decl., Exh. F, p. 7). On May 13, 2009, Trumbull removed that action to this Court pursuant to 28 U.S.C. §§ 1441 and 1446 based on diversity of citizenship. (*See* Notice of Removal). With discovery complete, and the parties cross-move for summary judgment.

6

## Standard of Review

A motion for summary judgment shall be granted when "the pleadings, the discovery and disclosure materials on file, and any affidavits show 'that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Brown v. Eli Lilly and Co.*, 654 F.3d 347, 358 (2d Cir. 2011) (quoting Fed. R. Civ. P. 56(a)); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). "In deciding a motion for summary judgment, 'the court cannot *try* issues of fact but can only determine whether there *are* issues of fact to be tried.'" *Sutera v. Schering Corp.*, 73 F.3d 13, 16 (2d Cir. 1995) (*quoting Katz v. Goodyear Tire & Rubber Co.*, 737 F.2d 238, 244 (2d Cir. 1984)) (emphasis in original). In a contract dispute, summary judgment is only appropriate where the agreement is unambiguous and conveys a definite meaning. *Sayers v. Rochester Tel. Supplemental Mgmt. Pension Plan*, 7 F.3d 1091, 1094 (2d Cir. 1993). Under New York law, "the threshold decision on whether a [contract] is ambiguous is the exclusive province of the court." *Sutton v. East River Sav. Bank*, 55 N.Y.2d 550, 553, 435 N.E.2d 1075, 1077, 450 N.Y.S.2d 460, 462 (1982). Notably, however, "doubtful or uncertain language leading to ambiguity will be interpreted against the insurer." *Ins. Co. of Greater N.Y. v. Clermont Armory, LLC*, 84 A.D.3d 1168, 1170, 923 N.Y.S.2d 661, 664 (2d Dep't 2011).

The burden rests with the moving party to demonstrate that there is no genuine issue as to any material fact. *See, e.g., Jeffreys v. City of New York*, 426 F.3d 549, 554 (2d Cir. 2005). "[A] court is required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." *Allstate Ins. Co. v. Hamilton Beach/Proctor Silex, Inc.*, 473 F.3d 450, 456 (2d Cir. 207) (internal quotations and citations omitted). However, the nonmoving party "may not rest upon the mere allegations or denials of

7

his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial."

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *see also Celotex*, 477 U.S. at 324

(Rule 56(e) "requires the nonmoving party to go beyond the pleadings" and, through affidavits,

depositions, interrogatory answers, and/or admissions on file, "designate specific facts showing

that there is a genuine issue for trial"). Moreover, "the mere existence of some alleged factual

dispute between the parties will not defeat an otherwise properly supported motion for summary

judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson,* 447 U.S.

at 247-48 (emphasis in original). No genuine issue of material fact exists "unless there is

sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If

the evidence is merely colorable, or is not significantly probative, summary judgment may be

granted." *Id.* at 249-50 (citations omitted).

Here, the parties have cross-moved for summary judgment. Because both the JCC and

Trumbull are simultaneously moving and nonmoving parties, the facts are reviewed separately in

the light most favorable to the party opposing that motion. *See Morales v. Quintel Entm't, Inc.,*

249 F.3d 115, 121 (2d Cir. 2001) ("The same standard applies where, as here, the parties filed

cross-motions for summary judgment[;] . . . each party's motion must be examined on its own

merits, and in each case all reasonable inferences must be drawn against the party whose motion

is under consideration.") (internal citations omitted).

<u>Discussion</u>

a. *An Insurer's Duty to Defend and Indemnify*

It is well established that an insurer's duty to defend is broader than its duty to indemnify.

*Automobile Ins. Co. of Hartford v. Cook*, 7 N.Y.3d 131, 137, 850 N.E.2d 1152, 818 N.Y.S.2d

176 (2006). As the duty to defend is "exceedingly broad," an insurer must defend whenever the

allegations within the four corners of the underlying complaint may give rise to coverage, *see id.*, or where the insurer "has actual knowledge of facts establishing a reasonable possibility of coverage." *Frontier Insulation Contractors, Inc. v. Merchants Mut. Ins. Co.*, 91 N.Y.2d 169, 175, 690 N.E.2d 866, 667 N.Y.S.2d 982 (1997) (internal quotations and citations omitted). "If, liberally construed, the claim is within the embrace of the policy, the insurer must come forward to defend its insured no matter how groundless, false or baseless the suit may be." *Automobile Ins. Co. of Hartford*, 7 N.Y.3d at 137 (internal quotations omitted).

On the other hand, there is no duty to defend if, "as a matter of law[,] . . . there is no possible factual or legal basis on which [the insurer] might eventually be obligated to indemnify its insured under any policy provision." *Allstate Ins. Co. v. Zuk*, 78 N.Y.2d 41, 45, 574 N.E.2d 1035, 571 N.Y.S.2d 429 (1991). In evaluating an insurer's duty to defend, a court must focus on the facts alleged, not the legal characterizations that the parties offer. *See, e.g., Allstate Ins. Co. v. Mugavero*, 79 N.Y.2d 153, 162, 589 N.E.2d 365, 581 N.Y.S.2d 142 (1992). In the case of a policy exclusion, such as the amended wrongful acts exclusion, the insurer must "provide a defense unless it can demonstrate that the allegations of the complaint cast that pleading solely and entirely within the policy exclusions, and, further, that the allegations, *in toto*, are subject to no other interpretation." *Id.* at 159 (internal quotations omitted).

The duty to indemnify is another matter. That duty "is determined by the actual basis for the insured's liability to a third person," rather than the mere allegations in the pleadings. *Servidone Const. Corp. v. Security Ins. Co. of Hartford*, 64 N.Y.2d 419, 424, 477 N.E.2d 441, 444 488 N.Y.S.2d 139, 142 (1985). Generally, "[i]nsurance contracts must be interpreted according to common speech and consistent with the reasonable expectations of the average insured." *Cragg v. Allstate Indem. Corp.*, 17 N.Y.3d 118, 122, 950 N.E.2d 500, 926 N.Y.S.2d

9

867, 869 (2011).

However, any ambiguity in an exclusionary clause must be "construed . . . in favor of the insured." *Id.* Furthermore, to the extent that the insurer seeks to avoid indemnification by asserting an exclusionary clause in the insurance policy, "the law governing [such clauses] is highly favorable to insureds." *Pioneer Tower Owners Ass'n v. State Farm Fire & Cas. Co.*, 12 N.Y.3d 302, 306, 908 N.E.2d 875, 876, 880 N.Y.S.2d 885, 886 (2009). As the New York Court of Appeals instructs,

> whenever an insurer wishes to exclude certain coverage from its policy
> obligations, it must do so in clear and unmistakable language. Any such
> exclusions or exceptions from policy coverage must be specific and clear in order
> to be enforced. They are not to be extended by interpretation or implication, but
> are to be accorded a strict and narrow construction. Indeed, before an insurance
> company is permitted to avoid policy coverage, it must satisfy the burden which it
> bears of establishing that the exclusions or exemptions apply in the particular
> case, and that they are subject to no other reasonable interpretation.

*Seaboard Sur. Co. v. Gillette Co.*, 64 N.Y.2d 304, 311, 476 N.E.2d 272, 275, 486 N.Y.S.2d 873, 876 (1984) (internal citations omitted).

### b. *The Coverage Provision*

The JCC argues that the Spinelli lawsuit falls squarely within the scope of the coverage provision of the policy Trumball wrote because the action targets the wrongful acts of individual insureds, like those JCC employees who had supervisory responsibilities for Sanders. Specifically, it asserts that "the allegations in the [Spinelli lawsuit] are that the JCC 'permitted and allowed and made it [sic] possible' Sander's [sic] despicable activities, '[failed] to provide [Spinelli] with a hostility-free work place,' and failed to monitor Sanders and prevent his activities." (Pl.'s SJ Mem. at 10-11). It goes on to point out that "[the] Policy's definition of 'wrongful acts' specifically includes 'vicarious liability for workplace harassment (including sexual harassment).'" (*Id.* at 11). Following logically, the JCC concludes that "the allegations in

the underlying action constitute wrongful acts as defined by the . . . Policy," and that "the JCC employees who allegedly could have or should have prevented Sander's [sic] abuses are 'individual insureds' with respect to Spinelli's claims.'" (*Id.* at 11-12).

Of course, the JCC vigorously denies that Sanders himself qualifies as an individual insured within the meaning of the coverage provision. It protests that "Sanders could only qualify as an INDIVIDUAL INSURED . . . if his reprehensible actions were performed 'solely out of the discharge of his duties' on behalf of the JCC." (*Id.*) Because, it contends, Sanders was "acting solely in his own interests and surely not 'solely out of the discharge of his duties,'" he cannot be considered an individual insured. To that end, the JCC refers to an affidavit from Lewis Stolzenberg, the JCC's Executive Director when Sanders was employed, in which Stolzenberg "categorically rejects the assertion that the deplorable acts of sexual misconduct committed by Drew Sanders were undertaken for the purpose of discharging his duties on behalf of the JCC." (Pl.'s Opp. Mem. to Def.'s SJ Motion (Dkt. No. 18) at 8 (citing Stolzenberg Aff. (Dkt. No. 20) ¶ 9). The upshot of the JCC's argument is this: that the Spinelli lawsuit does not target Sanders's wrongful acts, but rather the JCC's independent failure to properly supervise Sanders and to prevent Spinelli's injuries from having occurred in the first instance.

Trumbull, obviously, espouses a very different view of reality, one laser-focused on Sanders. It contends that "[t]he Spinelli lawsuit undeniably arises from Sanders's acts of forcible touching," which were the "'but for' cause of Spinelli's claim against JCC's [sic] for a violation of the New York Human Rights Law. That other employees might have contributed to the harm by failing to prevent or supervise Sanders is irrelevant . . . ." (Def.'s Opp. Mem. to Pl.'s SJ Motion (Dkt. No. 29) at 3). It further argues that, although the JCC "appears to assert that . . . the Spinelli lawsuit arises from the Wrongful Acts of other, unnamed JCC employees, who

11

purportedly were Individual Insureds that failed to supervise Sanders," the complaint in the Spinelli lawsuit "does not identify, nor does it make any specific allegations against, any particular individual other than Sanders." (*Id.* at 3-4). Trumbull argues that the underlying action arose entirely from Sanders's acts alone, and that "there can be no coverage . . . based on these 'phantom Insureds'"—that is, the unnamed individual tortfeasors that the JCC claims were responsible for the actions complained of in the Spinelli lawsuit. (*Id.* at 4). (*See also, e.g.*, Def.'s Reply Mem. (Dkt. No. 21) at 2 ("[T]here is not a single paragraph of the [Spinelli] Complaint . . . that alleges that JCC's supervisors negligently hired or failed to supervise Sanders . . . JCC cannot red-raft the complaint in the Spinelli lawsuit to try and create coverage where none exists by concocting phantom Individual Insureds and phantom claims where non exist.")).

As for Sanders, Trumbull seems to be of two minds—it was (rather conveniently) *for* acknowledging his status as an individual insured before it was *against* it. In its September 25, 2008 letter denying coverage, Trumbull announced its position that Sanders was, indeed, an Individual Insured, since the "[t]he allegations in the [Spinelli] Complaint alleged Wrongful Acts committed by Sanders which arise solely out of the discharge of his duties on behalf of the JCC." (Pl.'s SJ Mem., Exh. F at PDF p. 4). Trumbull reiterated this position in its memorandum in support of summary judgment, in which it asserted that "[t]here is no dispute that Sanders is an Individual Insured," and that "[a] plain reading of the complaint in the Spinelli lawsuit clearly shows that Sanders's criminal misconduct forms the very basis of the claims against JCC." (Def.'s SJ Mem. (Dkt. No. 16) at 5). At that stage in the litigation, Trumbull's sole argument was that the amended wrongful acts exclusion barred coverage.

But, then, after the JCC denied in its briefs that Sanders was an Individual Insured, Trumbull slammed into reverse, spying what it apparently believed was a more auspicious

12

litigation stance: that the amended wrongful acts exclusion applied *and* that the Spinelli lawsuit did not fall within the coverage provision in the first place because no Individual Insureds—including Sanders—were named in the action. Cagily, if not beyond the bounds of fair comment, Trumbull states in its reply brief that "[the] JCC admits that the Wrongful Acts by Sanders did not arise solely of the discharge of an Individual Insured's duties on behalf of JCC," and endorses anew the JCC's argument that "when an employee is convicted of a crime"—such as Sanders—"he or she is not an 'Individual Insured' because crimes are never part of the discharge of an employee's duties." (Def.'s Reply Mem. at 3-4; *see also* Def.'s Opp. Mem. to Pl.'s SJ Motion at 3 ("Since JCC concedes that Sanders acted outside the discharge of his duties, he is not an Individual Insured under the Policy.")). In sum, depending on which of Trumbull's briefs the Court is to accept, Sanders either was or was not (in Trumbull's view) an Individual Insured. Trumbull is consistent, though, in maintaining that Sanders's admitted conduct triggered the amended wrongful acts exclusion, and discharged any responsibility the insurer may have had to provide coverage to the JCC as a defendant in the Spinelli lawsuit.

To determine whether the Spinelli lawsuit falls within the coverage provision, the Court must interpret the language of that clause, which applies to "CLAIM(s) first made against the INSURED for a WRONGFUL ACT(s) which arise solely out of the discharge of an INDIVIDUAL INSURED'S duties on behalf of the ENTITY." (Simnowitz Decl., Exh. A at PDF p. 4). That the parties dispute the meaning of this language "does not in itself render the provision ambiguous." *Fiserv Solutions, Inc. v. XL Specialty Ins. Co.*, 94 A.D.3d 456, 467, 943 N.Y.S.2d 1, 9 (2d Dep't 2012). It bears repeating that "the threshold decision on whether a [contract] is ambiguous is the exclusive province of the court," and does not depend on the interpretations adopted by the parties. *Sutton*, 55 N.Y.2d at 553.

The language in focus, the Court finds, is unambiguous and supports only one common sense interpretation: that the Spinelli lawsuit does, indeed, fall within the scope of the policy's coverage provision. First, there is no dispute that the suit is a "CLAIM" against an "INSURED"—the JCC itself. Second, the "CLAIM" fundamentally seeks redress for the sexual abuse Spinelli suffered at the hands of Sanders. The JCC argues that the suit actually targets its own failure to prevent Sanders's actions—the sexual abuse and endangerment of one of its employees, Spinelli. But, the JCC overreaches in suggesting Sanders's assault on his teenaged victim was not also in the crosshairs of the Spinelli lawsuit. Plainly, if the sexual abuse had not happened, there would clearly be no lawsuit at all. The Spinelli complaint spends paragraph after paragraph describing the abuse and its aftermath, (*see* Simnowitz Decl., Exh. B ¶¶ 5-24, 31-33), asserts causes of action for sexual harassment and unlawful gender discrimination (claims made under the New York State Human Rights Law that, in this context, can only arise out of Spinelli's and Sanders's employment relationship with the JCC), (*see id.* ¶¶ 36-48), and seeks a measure of damages—$20 million—that accords with physical, emotional and psychological injuries resulting from sexual abuse (*see id.* ¶¶ 47-49). The operative facts of the lawsuit turn on the abusive conduct itself, regardless of precisely how the specific charges against the JCC are legally characterized in the Spinelli complaint.

More to the point, the Spinelli complaint asserts that "[p]articipation by Sanders, a superior officer, in the course of [Spinelli's] employment, constitutes participation by the Jewish Community Center itself," an unambiguous statement of vicarious liability. (*Id.* ¶ 27). The term "WRONGFUL ACT(s)" as it appears in the coverage provision includes "vicarious liability for workplace harassment (including sexual harassment)." (Simnowitz Decl., Exh. A at PDF p. 10). The provision includes no carve-out or exception for workplace sexual harassment that is later

14

successfully prosecuted as a crime. Thus, regardless of whether the Spinelli Complaint may *also* attribute some independent responsibility to JCC for Spinelli's injuries, such as negligent supervision, it explicitly charges the organization with vicarious liability for *Sanders's* actions. There can be no doubt that his conduct involved "WRONGFUL ACTS," which are defined under the Policy to include "wrongful discipline," "employment-related mental anguish or employment related distress," "discrimination,"[7] and "[a]ny actual or alleged Personal Injury," all of which are apt characterizations of Sanders's actions. (*Id.*). Therefore, notwithstanding any other plausible legal theories or cause of action advanced against the JCC in the Spinelli complaint, it is readily apparent that the Spinelli lawsuit is a "CLAIM against the INSURED for WRONGFUL ACT(s)" committed by Sanders. And, it is over this claim that the parties now joust.

The crucial issue in contention on this theory of liability is whether these wrongful acts "ar[o]se solely out of the discharge of an INDIVIDUAL INSURED'S duties on behalf of the ENTITY." As noted earlier, the JCC maintains that Sanders was not an "INDIVIDUAL INSURED," and that in abusing Spinelli, he "was acting solely in his own interests, and surely not 'solely out of the discharge of his duties' for the JCC." (Pl.'s SJ Mem. at 11-12). As discussed early, Trumbull's 2008 letter denying coverage and its opening brief espouse the opposite view—that Sanders was an Individual Insured, who committed the same crimes but while acting within the scope of his employment duties. (Def.'s SJ Mem. at 5, Exh. F at PDF p. 4). In its reply, Trumbull adopts a stance similar to the JCC's and asserts that "when an employee is convicted of a crime, he or she is not an 'Individual Insured' because crimes are

---

[7] The Spinelli Complaint alleges that the boy suffered "acts of unlawful gender discrimination," in violation of the New York Human Rights Law, Chapter I, Title 8, § 8-107(1)(a). (*See* Simnowitz Decl., Exh. B ¶¶ 45-48).

never part of the discharge of an employee's duties." (Def.'s Reply Mem. at 3).

Presented with a potpourri of possible constructions, the Court pursues its independent analysis and interpretation of the core language. According to the Policy, the term "INDIVIDUAL INSURED" refers to "[a]ny past, present or future director, officer, trustee, employee, volunteer or member of any duly constituted committee of the ENTITY, but only with regard to WRONGFUL ACTS which arise solely out of the discharge of the INDIVIDUAL INSURED'S duties on behalf of the ENTITY." (Simnowitz Decl., Exh. A at PDF p. 9). Both the JCC and Trumbull overlook the fact that the key phrase here (which is repeated, somewhat redundantly, in the coverage provision) does not refer to wrongful acts committed solely *for the purpose of* benefitting the entity, for instance, or wrongful acts committed solely *as a function of* the individual insured's duties. Rather, the language refers to wrongful acts that "*ar[o]se* solely out of the discharge of an INDIVIDUAL INSURED'S duties on behalf of the ENTITY." Put differently, the wrongful act does not *define* the duty: it merely must occur in the course of the insured's performance of whatever his employment duties are.

Consider, for example, an employee driving an automobile on the road to make a delivery for his employer. The employee receives a text message on his phone, averts his eyes from the road to read the message, and negligently hits and injures a pedestrian entering a crosswalk. The driver has clearly committed a "wrongful act." Breaking traffic laws and driving negligently would obviously not be part of the driver's duties. But, making deliveries for his employer clearly *would* fall within the scope of his employment activities. Therefore, any damage claims arising out of the driver's violation of the traffic laws would arise out of the discharge of his employment duties.

New York's law is in full harmony with this hypothetical, as its "interpretation of 'arising

16

out of' in general liability insurance contracts is indeed broad." *Purdue Frederick Co. v. Steadfast Ins. Co.*, No. 601345/04, 2005 WL 1662028, at *5 (N.Y. Supreme Ct., New York Cnty., July 12, 2005). *See, e.g., Aetna Casualty & Surety Co. v. Liberty Mutual Ins. Co.*, 91 A.D.2d 317, 320-21, 459 N.Y.S.2d 158 (4th Dept. 1983) (in the context of an insurance coverage provision, "[t]he words 'arising out of' have broader significance than the words 'caused by,' and are ordinarily understood to mean originating from, incident to, or having connection with") (internal quotations omitted); *N.H. Ins. Co. v. Jefferson Ins. Co. of N.Y.*, 213 A.D.2d 325, 330, 624 N.Y.S.2d 392 (1st Dep't 1995) (interpreting "arising out of" similarly in the context of an exclusion provision). New York's highest court has held that the terms "based on" and "arising out of," when appearing either in a coverage or exclusion provision of an insurance policy, are essentially indistinguishable and are not ambiguous. *Mount Vernon Fire Ins. Co. v. Creative Housing Ltd.*, 88 N.Y.2d 347, 351-52, 668 N.E.2d 404, 645 N.Y.S.2d 433 (1996). Case law manifestly instructs that these terms require application of a "but-for" causation test. *Id.* at 350, 352-53 (citing *U.S. Underwriters Ins. Co. v. Val-Blue Corp.*, 85 N.Y.2d 821, 823, 647 N.E.2d 1342, 623 N.Y.S.2d 834 (1995)). Hence, if a particular consequence would not have occurred but for engagement in a given transaction, it can be said to have "arisen out of" that transaction.

With this in mind, the Court has little difficulty concluding that the wrongful acts that gave rise to the Spinelli lawsuit "arose solely out of" the discharge of Sanders's duties for the JCC. These actions occurred during an employment break time activity called "Pressure Shot," which Sanders required Spinelli, as well as other young employees he supervised, to play during their work day and under his supervision and control. Sanders had the ability to force these children to play the game and to suffer the cruel punishment he meted out solely because he held a position of authority over them as their JCC employment supervisor. All of the facts in the

17

record indicate that the abuse occurred on JCC property during the hours that Sanders oversaw Spinelli and other young employees.

While the parties debate the legal consequence of these facts, there is no genuine dispute about the facts themselves. It cannot seriously be disputed, accordingly, that Sanders's abuse of Spinelli would not have occurred but for Sanders's supervisory authority over the boy, and Sanders's management of that supervisor-employee relationship fell solely within the scope of his duties on behalf of the JCC. (*See* Stolzenberg Aff., Exh. B at 3 (including "supervis[ing] . . . staff" among the duties assigned to Sanders). There is no ambiguity: Sanders's malicious activities arose solely out of his role as a supervisor of Spinelli. Per force, as a "past . . . employee," Sanders is an individual insured, and his wrongful acts arose solely out of the discharge of his duties on behalf of the JCC.

The parties both contend (but for different reasons) that Sanders's actions could not have fallen within the scope of his duties because sexually harassing other workers was not and could not have been part of his job description. This argument fails for at least two reasons. First, as discussed above, this contention ignores the plain language of the coverage provision and the breadth that New York courts have ascribed to the phrase "arising out of," at least in an insurance context. Second, it overlooks the fact that virtually all of the examples of "WRONGFUL ACTS" that the policy describes could not possibly be among an employee's official duties. For instance, the policy lists as potential wrongful acts "neglect or breach of duty," "mismanagement of the ENTITY's funds," "discrimination," "breach of . . . contract," "negligent evaluation," "libel," "slander," "false arrest," "invasion of privacy," "plagiarism," and—most relevant here—"vicarious liability for workplace harassment (including sexual harassment)." While all of these actions could "arise out of" an employee's discharge of his

18

duties, none could realistically be counted *among* his duties; in fact, several (such as breach of duty and mismanagement of funds) are defined directly *against* such duties. Yet, the policy explicitly contemplates coverage for all these acts nonetheless. Indeed, it is virtually impossible to imagine an action that would *both* be "a wrongful act" within the meaning of the coverage provision *and* would be included among an employee's official catalog of duties. To adopt the arguments advanced by the parties on this score would render the coverage provision a legal nullity.

The Court concludes, in line with this analysis, that the Spinelli lawsuit is a "CLAIM(s) first made against the INSURED for a WRONGFUL ACT(s) which arise solely out of the discharge of an INDIVIDUAL INSURED'S duties on behalf of the ENTITY."[8] (Simnowitz Decl., Exh. A at PDF p. 4). Spinelli's alleged claims against the JCC resulting from Sanders's criminal acts and the failure of other JCC agents or employees to prevent them are well within the ambit of the policy's coverage provision. Accordingly, the filing of the Spinelli lawsuit triggered Trumbull's obligation to pay "all CLAIM EXPENSES and DAMAGES" for which the JCC has or will become liable as a result of that action, (*id.*), unless otherwise subject to a valid policy or statutory exclusion.

### c. *The Criminal Acts Exclusion and New York Insurance Law § 3420(d)(2)*

Trumbull argues that, regardless of the coverage provision, the policy's amended wrongful acts exclusion applies to the Spinelli lawsuit and disqualifies it from coverage. (*See* Def.'s SJ Mem. at 5-12; Def.'s Opp. Mem. to Pl.'s SJ Motion at 3-7; Def.'s Reply Mem. at 3-6).

---

[8]   Because the Court holds that Sanders was an individual insured within the meaning of the coverage provision, it declines to consider whether (as the JCC asserts) unnamed employees (or "phantom insureds," as Trumbull tartly dubs them) who supervised Sanders or oversaw the organization's training program might also qualify as individual insureds, notwithstanding Sanders's status as an individual insured or his alleged criminal conduct.

The JCC vigorously disagrees. But, it also contends that any such argument is moot, since Trumbull has waived its right to assert the exclusion due to its failure to timely disclaim coverage in accord with New York Insurance Law § 3420(d)(2). (*See* Pl.'s SJ Mem. at 11-14; Pl.'s Opp. Mem. to Def.'s SJ Motion at 7-15; Pl.'s Reply Mem. (Dkt. No. 3) at 5-11). Trumbull disputes that § 3420(d)(2) applies at all and affirmatively argues that it properly asserted the exclusion as a bar to coverage. (*See* Def.'s Opp. Mem. to Pl.'s SJ Motion at 7-13; Def.'s Reply Mem. at 6-7). The Court finds that § 3420(d)(2) does apply and that Trumbull failed to timely assert the exclusion provision under that statute's requirements.

New York Insurance Law §3420(d)(2) provides that

[i]f under a liability policy issued or delivered in this state, an insurer shall disclaim liability or deny coverage for death or bodily injury arising out of a motor vehicle accident or any other type of accident occurring in this state, it shall give written notice as soon as is reasonably possible of such disclaimer of liability or denial of coverage to the insured and the injured claimant or any other claimant.

The JCC predicates its §3420(d)(2) reliance on the fact that the emotional distress claimed by Spinelli is considered a "bodily injury" for insurance liability purposes. (*See, e.g.*, Pl.'s SJ Mem. at 13-14). It further contends that, from its own vantage point as the insured, Sanders's actions were "unexpected, unusual, unintended, or unforeseen," and therefore, an "accident" within the meaning of §3420(d)(2). (*Id.* at 13). Finally, the JCC asserts that, under the statute, the gap of 105 days (if not over two years) between when the JCC notified Trumbull of its claim and when Trumbull disclaimed coverage under the amended wrongful acts exclusion was unreasonable as a matter of law. Given the definite clarity of New York decisional law on this point, there is no way, the JCC argues, that "Trumbull can offer [a] reasonable excuse for its 105-day delay in disclaiming coverage, and its application of the [exclusion] will be deemed to have been waived" under § 3420(d)(2). (*Id.* at 14-15).

20

Trumbull ripostes that § 3420(d)(2) does not apply at all to the JCC's claim because the statute refers only to "claims arising from death or bodily injury caused by an *accident*," whereas "[t]he Spinelli [l]awsuit undeniably arises from Sanders's *intentional* acts of sexual abuse." (Def.'s Opp. Mem. to Pl.'s SJ Motion at 7) (emphasis in brief). Trumbull catalogs the ways in which Sanders's actions were willful and forcible, rather than accidental; various cases are cited holding that sexual harassment and assault are inherently intentional acts that cannot be considered "accidents" for insurance purposes. (*Id.* at 7-12; Def.'s Reply Mem. at 6-7). For that reason alone, Trumbull contends, the statute does not apply. Placing all of its eggs in that basket, Trumbull declines to address whether Spinelli's claim involved "bodily injury," or whether its 105-delay was unreasonable as a matter of law.

### i.    The JCC's Claim Involves an "Accident" Under § 3420(d)(2)

The JCC argues that, with regard to the "accidental" nature of the claim against it, the totality of its potential liability to Spinelli in the underlying lawsuit must be considered. It asserts that, from its own standpoint, Sanders's abuse of Spinelli was entirely unexpected and unforeseen. Hence, as the insured party, it seeks coverage for an "accident." (*See, e.g.*, Pl.'s SJ Mem. at 13). Trumbul's dismissive rebuttal is cloaked in Sanders's admission that he committed intentional criminal acts. (Def.'s Opp. Mem. to Pl.'s SJ Motion at 7-12; Def.'s Reply Mem. at 6-7).

Trumbull's theory that § 3420(d)(2) does not apply because Sanders's conduct was intentional, not accidental, as some precedent. For instance, in *Kantrow v. Security Mutual Ins. Co.*, 49 A.D.3d 818, 819, 854 N.Y.S.2d 738 (2d Dep't 2008), a minor plaintiff brought suit against the parents of another minor who had sexually assaulted her on a theory of negligent supervision. The parents sought indemnification from their insurer, but the Second Department

21

rejected their claim, finding that the underlying sexual assault was intentional, rather than an "occurrence"—that is, an accident—within the meaning of the defendant parents' policy. The Fourth Department held similarly in *Bd. of Educ. of E. Syracuse-Minoa Cent. School Dist. v Continental Ins. Co.*, 198 A.D.2d 816, 817, 604 N.Y.S.2d 399 (4th Dep't 1993), in which it ruled that a former teacher's negligent supervision claim against the school district was premised on a fundamentally intentional action—an allegation of sexual harassment. Hence, the underlying incident was not an "occurrence" or accident within the policy's coverage provision. *Id.* And, in *First Fin. Ins. Co. v. XLNT Recovery Specialist, Inc.*, No. 98-Civ-5033 (DAB) (JCF), 2000 WL 943499, at **5-6 (S.D.N.Y. July 7, 2000), the court held that the insured party, XLNT, could not rely on § 3420(d)(2), since the negligence lawsuit for which it sought indemnification was based on the intentional torts of its employees, rather than an accident. *See id.* at *6 ("Section 3420(d)(2) clearly applies only to accidents . . . [whereas] the allegations against XLNT concern intentional acts, and First Financial therefore had no duty to provide a disclaimer."). (*See generally* Def.'s Opp. Mem. to Pl.'s SJ Motion at 7-12 (citing these and other cases)).

Yet, with one exception, every decision Trumbull cites comes either from an intermediate appellate court or a federal district court.[9] It is axiomatic that "[i]n deciding a disputed issue of

---

[9]   Trumbull mischaracterizes the other federal case it cites on this point. Although the court in *TIG Ins. Co. v. Town of Cheektowaga*, 142 F.Supp.2d 343 (W.D.N.Y. 2000) *initially* found § 3420(d)(2) inapplicable because the underlying actions—the long-term, intentional disposal of waste by the city—were intentional rather than accidental, it later modified its holding after the Second Circuit rejected its narrow definition of "accident" in *Olin Corp. v. Insurance Co. of N. Am.*, 221 F.3d 307 (2d Cir. 2000). In its modified opinion, the *TIG* court again held that § 3420(d)(2) did not apply, but *not* because the city disposed of the waste intentionally. Instead, it interpreted the term "accident" to "contemplate[] a distinguishable injury-causing event," as opposed to "an injury-causing series of events that happened over a substantial period of time," such as the long-term disposal of waste for which the city was being sued. *TIG* is therefore inapposite: Sanders's abuse of Spinelli occurred sporadically over a relatively short period of two years (as opposed to the multiple decades of planned and regular waste disposal described in *TIG*), and each instance of assault caused new and

state law in a diversity case, a federal district court should attempt to discern what the *highest court* of that state would decide." *L-Tec Elec. Corp. v. Cougar Elec. Org., Inc.*, 198 F.3d 85, 87 (2d Cir. 1999) (emphasis added). "While rulings of intermediate state appellate courts *may* be persuasive in . . . diversity cases . . . , a federal court is bound *only* to follow the precedents of the state's highest court and should . . . follow the view of the law which it finds that the state's highest court reasonably would be expected to adopt." *West-Fair Elec. Contractors v. Aetna Cas. & Sur. Co.*, 872 F.Supp. 1212, 1214 (S.D.N.Y. 1994) (emphasis added).

That there is a variance between Trumbull's assessemt and the law of New York as declared by its high court is not hypothetical. There is another, and contrary, strain of relevant New York case law. Pointedly, the cases dispositive here are not those that Trumbull cites, but are rather those it ignores: the New York Court of Appeals' decisions in *Agoado Realty Corp. v. United Int'l Ins. Co.*, 95 N.Y.2d 141, 733 N.E.2d 213, 711 N.Y.S.2d 141 (2000) and *RJC Realty Holding Corp.* v. *Republic Franklin Ins. Co.*, 2 N.Y.3d 158, 808 N.E.2d 1263, 777 N.Y.S.2d 4 (2004). In *Agoado*, the Court of Appeals considered whether the murder of a tenant by an unknown perpetrator constituted an "occurrence"—that is, an accident—within the meaning of the landlord's insurance policy. 95 N.Y.2d at 143-45. Noting that "[t]he term 'accident' is broadly defined in our jurisprudence, utilizing an average person standard," the court held that "it must be determined, *from the point of view of the insured,* whether the loss was unexpected, unusual and unforeseen," and hence "accidental." *Id.* at 145 (emphasis in original). Accordingly, "the murder constitute[d] an accident for purposes of determining defendant's obligations to its insured," since the incident was "unexpected, unusual and unforeseeable *from the insured's*

---

discrete injuries (as opposed to the gradual and cumulative harm caused by the prolonged, managed, and systematic waste disposal).

*standpoint. . . .* Thus, [it was] a covered 'occurrence' under the express terms of the policy." *Id.*

*RJC* extended *Agoado's* holding to a set of facts very similar to the one presented in the

Spinelli lawsuit. In *RJC*, a health spa customer brought a negligence action against RJC on

account of sexual abuse she had suffered at the hands of a spa employee. Precisely as the JCC

did, RJC then sought coverage under its insurance policy. 2 N.Y.3d at 161-62. Once again, the

key questions were "whether the alleged sexual assault was an 'accident' and therefore an

'occurrence' within the meaning of the policy, and whether it was excluded from coverage as an

act 'expected or intended from the standpoint of the insured.'" *Id.* at 163. Citing *Agoado* and

*Judith M. v. Sisters of Charity Hosp.*, 93 N.Y.2d 932, 715 N.E.2d 95, 693 N.Y.S.2d 67 (1999),

the high court reasoned that, because the employee had "departed from his duties for solely

personal motives unrelated to the furtherance of [RJC's] business," his "expectations or

intentions" could not be attributed to RJC itself.[10] *Id.* at 164. Applying this test, the court held

that the employee's sexually malicious acts were "'unexpected, unusual and unforeseen' from

RJC's point of view, and were not 'expected or intended' by RJC. Accordingly, they were an

'accident,' within the coverage of the policy . . . ." *Id.* at 164-65.

While *Agoado* and *RJC* do not deal directly with the language of § 3420(d)(2), there can

[10] In finding Sanders an individual insured, the Court rejected the JCC's "departure from duty" argument, judging it to be irrelevant whether Sanders's acts of sexual misconduct were or were not part of his employment responsibilities. *(See supra*, pp. 15-19). In that context, the breadth of the coverage provision's "arising solely out of" language mandated the use of a "but-for causation" test to evaluate the connection between the wrongful acts Sanders committed on the job and the Spinelli lawsuit, regardless of whether those acts were properly within his job description. However, in determining whether Sanders's misconduct was expected and foreseen from the JCC's standpoint, and therefore "accidental" within the meaning of § 3420(d)(2)), it surely *is* relevant whether or not his actions were committed in furtherance of his duties as a JCC employee. In other words, an employee who grossly abuses his supervisory authority and sexually abuses an underling may trigger a lawsuit "arising out of" the discharge of his duties, but that same conduct may well be so unexpected and unforeseen by his employer (which generally expects its employees not to abuse their powers in such a manner) that it is "accidental" from the employer's viewpoint.

24

be little doubt that they supply the definitive interpretation of the term "accident" in the context

of New York insurance law jurisprudence. The Court is fully persuaded that the New York Court

of Appeals would apply the reasoning of *RJC* and *Agoado* when, and if, called upon to interpret

the term "accident" as it appears in § 3420(d)(2). *See, e.g., NYAT Operating Corp. v. Gan Nat.*

*Ins. Co.*, 8 Misc.3d 975, 976-79, 800 N.Y.S.2d 272, 273-75 (Sup. Ct., New York Cnty., 2005)

(citing *RJC* and finding sexual assault to constitute an "accident" from the insured's/employer's

standpoint within the meaning of § 3420(d)(2)); *Penn-America Group, Inc. v. Zoobar, Inc.*, 305

A.D.2d 1116, 1116-17, 759 N.Y.S.2d 825, 826-28 (4th Dep't 2003) (holding that a nightclub

bouncer's assault of a patron was, with regard to a claim against the nightclub, an "accidental

occurrence" for the purposes of a §3420(d)(2), and overruling earlier Fourth Department

decisional law the contrary). It is hard to fathom how the high court could tolerate two different

definitions of the same word used in the same insurance law context. As such, this Court is

bound to construe § 3420(d)(2) in a manner consistent with the definition of "accident"

developed by the New York Court of Appeals in circumstances cut from the same cloth as those

presented here.

     Moreover, *Mugavero*, the sole New York Court of Appeals case that Trumbull cites on

this point, is not analogous. First, in that case, the insured was an individual who had been

personally accused of sexual assault. From *his* standpoint (and, since he was the insured, from

the insured's standpoint, too), his actions were, of course, expected and foreseen. *See* 79 N.Y.2d

at 159. It does not speak at all to the issue before the court in *RJC* (or, indeed, the instant case).

Unlike *Mugavero*, the individual tortfeasor in *RJC* was the insured's *employee* (and not the

insured's), whose wrongful acts were "unexpected, unusual and unforeseen" from the *employer's*

(that is, the insured's) standpoint. *Mugavero*, moreover, dates back to 1992,[11] *Agoado* and *RJC*

to 2000 and 2004, respectively. Even if there were a conflict between the former and the latter

two cases (and there is not), the more recent decisions—which Trumbull fails to cite or

address—would control.

Following *Agoado* and *RJC*, the Court finds that, as a matter of law, Sanders's abuse of

Spinelli was "unexpected, unusual and unforeseen" from the point of view of the JCC,

Trumbull's insured.[12] Nothing in the record indicates that the JCC knew about or had any reason

to expect or foresee Sanders's actions until after they had occurred and Spinelli notified his

mother of what had happened. The JCC denies that it knew or had reason to know of Sanders's

misconduct before this point, (*see* Pl.'s Mem. at 13; Stolzenberg Aff. ¶¶ 7-11), and Trumbull

does not argue otherwise. The crux of the Spinelli lawsuit, of course, is that the JCC should have

foreseen the criminal conduct perpetrated by Sanders, but neglected to take the steps necessary to

properly oversee Sanders and thereby either prevent his misconduct entirely or to stop it earlier,

depending upon how reasonable suspicion would have guided it. But, on the current fact record

in *this* case at summary judgment, there is no genuine disputed of material fact, and the Court

must conclude that, as a matter of law, Sanders's actions were "unexpected, unusual and

unforeseen" from the JCC's standpoint. Consequently, under New York insurance law

---

[11]   In its opposition and reply briefs, Trumbull incorrectly cites *Mugavero* as a 1995 case.

[12]   Although Sanders is an "Individual Insured" within the meaning of the Coverage Provision, that is effectively a term of art confined to the language of the Policy. It has no relevance as to the question of whether the Spinelli lawsuit involves a claim arising out of an accident. As case law makes evident, in a dispute over whether a claim involves an accident," the "insured" is simply the party to the litigation advocating for coverage, as opposed to the party seeking to disclaim coverage (i.e., the insurer). Thus, in this context, the JCC alone—and not Sanders—qualifies as the "insured."

pg

jurisprudence, the JCC has claimed coverage for an "accident" under the Trumbull policy, and this claim falls within the purview of § 3420(d)(2). As for the Spinelli lawsuit, it is for a different day and a different forum—Supreme Court of Richmond County—to determine whether the "accident" occurred because the JCC negligently failed to take steps that would put it in a position to foresee and, indeed, prevent, Sanders's misconduct from occurring in the first place. This Court takes no position on the merits of those claims.

      ii.     **The JCC's Claim Involves an "Bodily Injury" Under § 3420(d)(2)**

      That the essence of the JCC's claim is for accident coverage is not enough to trigger the protective effects of §3420(d)(2). To benefit from that provision, the JCC must show not only that its claim is based on an "accident," but that that the claim seeks to recover for "bodily injury" caused by that accident. It is readily apparent that the JCC's claim does, in fact, involve claims of "bodily injury." Trumbull itself states in its Rule 56.1 Statement, and the JCC does not dispute it, that, during games of "Pressure Shot," Sanders forced Spinelli (and other young employees) "to pull down their shorts and underwear, throwing them over his lap and viciously and repeatedly spanking the boys on the behind with his bare hand." (Def.'s Rule 56.1 Statement ¶ 12 (citing Simnowitz Decl., Exh. B ¶¶ 10-11); *see also* Pl.'s Response to Def.'s Rule 56.1 Statement (Dkt. No. 19) ¶ 12 ("[A]dmit[ting] that the complaint filed in the underlying Spinelli Action makes the stated allegations, among others.")). The Spinelli complaint also states (and the facts are undisputed here) that Sanders "physical[ly] injured" Spinelli and, "[i]n early July 2005 . . . locked [Spinelli] in his office, forced [him] to pull down his pants and underwear and forcibly struck him on the behind with the wooden paddle that he had previously displayed as a preview of what would happen if [Spinelli] did not behave at home." (Simnowitz Decl., Exh. B ¶¶ 13-

14).[13] There can be no dispute that the JCC seeks coverage for an accident involving "bodily injury."

Furthermore, the Spinelli complaint alleges that the then-minor plaintiff was "humiliated" and "emotionally . . . injured," that he "felt ashamed" and "helpless," and that he became "angry, defiant, erratic and withdrawn" as a result of the abuse he suffered. (Simnowitz Decl., Exh. B ¶¶ 13, 18-19). Neither Trumbull nor the JCC has disputed these allegations. But, they are significant on this point. New York courts have repeatedly held that emotional distress of the nature described in the Spinelli complaint constitutes "bodily injury" for insurance law purposes. *See, e.g., Tortoso v. MetLife Auto & Home Ins. Co.*, 21 A.D.3d 276, 278, 799 N.Y.S.2d 506, 508 (1st Dep't 2005) ("Where a policy provides coverage for 'bodily injury,' such coverage encompasses a claim for 'purely emotional distress.'"); *Lavanant v. Gen. Acc. Ins. Co. of America*, 164 A.D.2d 73, 79-80, 561 N.Y.S.2d 164, 168 (1st Dep't 1990) (interpreting the term "bodily injury" in an insurance policy to extend "beyond the physical harm that flows directly from trauma to include the emotional and psychological effects of incidents that are otherwise covered by the policy"), *aff'd* 79 N.Y.2d 623, 595 N.E.2d 819, 584 N.Y.S.2d 744 (1992); *Merchants Mut. Ins. Co. v. Allcity Ins. Co.*, 245 A.D.2d 590, 593, 664 N.Y.S.2d 690, 692 (3rd Dep't 1997) ("As correctly contended by plaintiff, an action seeking to recover for emotional distress may well fall within the ambit of Insurance Law § 3420(d)(2).").

In light of these holdings, the Court finds that both the physical and emotional pain

---

[13]  Although this assertion is not included in either party's Rule 56.1 Statement, it appears in the Spinelli Complaint, which is Exhibit B to the Simnowitz Declaration and is, resultingly, part of the record. As the Second Circuit has instructed, "while a court is not *required* to consider what the parties fail to point out in their Local Rule 56.1 statements, it *may* in its discretion opt to conduct an assiduous review of the record even where one of the parties has failed to file such a statement." *Holtz v. Rockefeller & Co., Inc.*, 258 F.3d 62, 73 (2d Cir. 2001) (emphasis added) (internal quotations omitted).

Spinelli claims to have suffered at the hands of Sanders qualifies as "bodily injury" within the meaning of § 3420(d)(2). Accordingly, because the JCC seeks "coverage for [a claim involving] . . . bodily injury arising out of a[n] . . . accident," § 3420(d)(2) is applicable and Trumbull's conduct in disclaiming coverage must be judged in its light.

### iii.    Trumbull's Delay in Disclaiming Coverage Was Unreasonable as a Matter of Law

Because § 3420(d)(2) applies, the Court must next determine whether Trumbull provided "written notice as soon as [was] reasonably possible of [any] disclaimer of liability or denial of coverage to the insured and the injured claimant or any other claimant." If Trumbull's delay in disclaiming coverage was not "reasonable," it will have waived its right to assert the amended wrongful acts exclusion. New York's enactment of the statute makes abundantly clear that it is the state's public policy "to protect the insured, the injured person, and any other interested party who has a real stake in the outcome, from being prejudiced by a belated denial of coverage." *Bovis Lend Lease LMB, Inc. v. Royal Surplus Lines Ins. Co.*, 27 A.D.3d 84, 90-91 806 N.Y.S.2d 53 (1st Dep't 2005). Underscoring the depth of this protective policy, it is also manifest that untimely notice by the insurer will effect a waiver "regardless of whether the insured is able to show prejudice resulting from the delay." *Dependible Janitorial Services Inc. v. Transcontinental Ins. Co.*, 212 A.D.2d 946, 947, 622 N.Y.S.2d 632, 634 (3d Dep't 1995) (citing *Allstate Ins. Co. v. Gross*, 27 N.Y.2d 263, 269, 317 N.Y.S.2d 309, 265 N.E.2d 736 (1970)); *see also First Fin. Ins. Co. v Jetco Contr. Corp.*, 1 N.Y.3d 64, 67 n.2, 801 N.E.2d 835, 769 N.Y.S.2d 459 (2003) (noting that whether or not the insured can show actual prejudice from the delay "is of no legal relevance" to § 3420(d)(2)).

"An insurer's delay is measured from the point at which it has sufficient knowledge of facts entitling it to disclaim, or knows that it will disclaim coverage." *Stout v. 1 East 66th St.*

29

*Corp.*, 90 A.D.3d 898, 901, 935 N.Y.S.2d 49 (2d Dep't 2011). The New York Court of Appeals has explicitly rejected any "fixed yardstick against which to measure the reasonableness, or unreasonableness, of an insurer's delay," holding instead that this determination will, in most instances, "be a question of fact, dependent on all of the circumstances of a case that make it reasonable, or unreasonable, for an insurer to investigate coverage." *First Fin.*, 1 N.Y.3d at 70; *see also State Farm Mut. Auto. Ins. Co. v. Clift*, 249 A.D.2d 800, 801, 671 N.Y.S.2d 843, 844 (3d Dep't, 1998) ("The reasonableness of any delay . . . generally is a question of fact for a jury to resolve.").

Yet, factual matters ordinarily reserved for jury resolution will become ripe for summary judgment when there is "no genuine issue of material fact." *10 Ellicott Square Court Corp. v. Mountain Valley Indem. Co.*, 634 F.3d 112, 119 (2d Cir. 2011).  In any event, it is the insurer's burden to demonstrate a "reasonable excuse for its delay in disclaiming coverage," *Stout*, 90 A.D.3d at 901, and the Court of Appeals has stated unmistakably that a delay may be unreasonable as a matter of law if it is "unexplained . . . [or] unexcused, meaning the [insurer's] explanation is unsatisfactory." *First Fin.*, 1 N.Y.3d at 70. Furthermore, "an insurer's explanation is insufficient as a matter of law where the basis for denying coverage was or should have been readily apparent before the onset of the delay." *Id.* at 69. Even where the basis for denying coverage is *not* readily apparent, an insurer's explanation will fall short unless the basis for delay was "reasonably related to [the insurer's] completion of a thorough and diligent investigation into the issues affecting its decision whether to disclaim coverage." *Stout,* 90 A.D.3d at 902 (internal quotations omitted). In *First Financial*, for example, the court held that an insurer's 48-day delay in disclaiming coverage was unreasonable as a matter of law where its only excuse was that it had been busy investigating alternate, third-party sources of insurance. *Id.* at 67, 69-

70. *See also Hartford Ins. Co. v Cnty. of Nassau*, 46 N.Y.2d 1028, 1029-30, 389 N.E.2d 1061, 416 N.Y.S.2d 539 (1979) (unexplained 62-day delay unreasonable as a matter of law); *West 16th St. Tenants Corp. v Pub. Serv. Mut. Ins. Co.*, 290 A.D.2d 278, 736 N.Y.S.2d 34 (1st Dep't 2002) (30-day delay unreasonable); *Squires v Marini Bldrs.*, 293 A.D.2d 808, 810, 739 N.Y.S.2d 777 (3d Dep't 2002); *Matter of Colonial Penn Ins. Co. v Pevzner*, 266 A.D.2d 391, 698 N.Y.S.2d 310 (2d Dep't. 1999) (41-day delay unreasonable); *Matter of Nationwide Mut. Ins. Co. v Steiner*, 199 A.D.2d 507, 507-08, 605 N.Y.S.2d 391 (3d Dep't 1993) (41-day delay unreasonable).

Following *First Financial, Hartford Insurance*, and a raft of intermediate appellate decisions, the Court finds that Trumbull's 105-day delay[14] in disclaiming coverage under the amended wrongful acts exclusion was unreasonable as a matter of law. Trumbull provides no excuse or explanation in for this delay. Indeed, its argument is totally bare on this point except for a bizarre footnote asserting that it "does not concede that its disclaimer of coverage was untimely and respectfully reserves the right to address that issue at a later date if necessary." (Def.'s Reply Mem. at 7 n.3). The train has left the station. The cross-motions for summary judgment in no uncertain or hidden terms brought Insurance Law § 3420(d)(2) front and center. That Trumbull chose to base its argument on that section's inapplicability to the matter before the Court on those motions is of no moment. Nor is Trumbull entitled to a do-over.

A more realistic understanding of Trumbull's posture on the issue of timely disclousre,

---

[14]  It could be argued that Trumbull's delay was actually 190 days, the time that elapsed between March 6, 2006—when the JCC first notified the insurer of the charges against Sanders—and September 7, 2006—when Trumbull finally responded by denying that the JCC's claim was ripe and reserving the right to assert the amended wrongful acts exclusion for any future claim. Indeed, Trumbull's response affirmed that any "any "later Claim" based on the allegations against Sanders "shall be considered to have been made *as of the date of notice of the underlying circumstances*"—that is, March 6, 2006. (Pl.'s SJ Mem, Exh. E at PDF p. 3) (emphasis added). However, because the Court holds that the shorter delay of 105 days was unreasonable as a matter of law, it need not decide whether 190 days is the more accurate tabulation of Trumbull's delay.

based on the facts that are not in genuine dispute, is that Trumbull said nothing because it had little, if anything, to say. It is immediately apparent from the face of the Spinelli complaint that the allegations against Sanders were not only wrongful but criminal in nature, and that he had pleaded guilty to them. To be sure, Trumbull's "basis for denying coverage"—that the actions underlying the Spinelli lawsuit fell within the amended wrongful acts exclusion—"was or should have been readily apparent before the onset of the delay," and any explanation it might proffer for the delay would be insufficient as a matter of law under *First Financial*, 1 N.Y.3d at 70 (a delay half as long as Trumbull's was unreasonable).

Furthermore, notice of the Spinelli complaint should not have come as a shock to Trumbull. The JCC had notified Trumbull of the charges against Sanders nearly *two years* before it finally submitted what the insurer had advised would be a ripe claim. The insurer cannot now honestly argue that it needed an additional three and a half months after receiving notification of the Spinelli lawsuit to conclude that it should take the position that the amended wrongful acts exclusion applied and coverage disclaimed. Trumbull has simply failed to meet its burden of providing a legally sufficient explanation or excuse for its delay, and the undisputed facts before the Court make crystal clear that the insurer's delay was unreasonable as a matter of law. Consequently, without deciding the substantive applicability of the amended wrongful acts exclusion, the Court holds that, under §3420(d)(2), Trumbull has waived any right it might have had to assert the amended wrongful acts exclusion and to disclaim coverage of the JCC's claim in this matter and to defend and indemnify it in the Spinelli lawsuit.

### Conclusion

For the foregoing reasons, the JCC's motion for summary judgment is granted and Trumbull's motion is denied. The Court finds that the JCC's claim against Trumbull for

32

coverage in connection with the Spinelli lawsuit falls within its policy provisions. It also finds that Trumbull has waived any right to disclaim coverage on the basis of any exclusion in the policy. The JCC is entitled to summary judgment and is awarded a declaration of its right to a defense and indemnification of the cause of action asserted against it in the Spinelli lawsuit.

The Clerk of Court is directed to enter Judgment accordingly and to close this case.

SO ORDERED.

s/ ENV

ERIC N. VITALIANO
United States District Judge

Dated: Brooklyn, New York
July 16, 2013

33